

FILED

MAY 2 2 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>　　　　　　　　　　Plaintiff,<br>　vs.<br><br>MAINO ROBIN DE LEON-GODINEZ,<br><br>　　　　　　　　　　Defendant. | CASE NO. 06 CR 2504 JM<br><br>**RULINGS ON DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS AND EVIDENCE** |

## BACKGROUND

Defendant has moved to suppress statements he made during his contact with Border Patrol Agents on November 1, 2006 at his home (under the Fourth and Fifth Amendments) and evidence acquired thereafter relating to his identity.

An evidentiary hearing was conducted on May 4, 2007 at which Defendant and Border Patrol Agents ("BPA") testified. The following facts are established as they are either undisputed or predicated upon a preponderance of the evidence.

On November 1, 2006, at approximately 5:50 A.M., Senior BPA Francisco Ramirez arrived at the apartment Defendant had been renting on Altadena Street, San Diego, for about one year. Agent Ramirez, accompanied by other BPAs, were members of a unit investigating human trafficking and present at Defendant's apartment for the purpose of conducting a "knock and talk." Specifically, they were looking for a female suspect named "Jessica", but had no warrant, either for Jessica or

1  for a search of Defendant's home.

2       Agent Ramirez knocked forcefully at the door to Defendant's apartment.
3  Defendant, who had been asleep, came to his door and asked "who is it." Agent
4  Ramirez responded, "Police" and, through a "peep hole" in the door, displayed his
5  identification to Defendant. When Agent Ramirez asked Defendant if "Jessica" was
6  in the apartment, Defendant responded that she was not. Agent Ramirez testified that
7  he then asked if he could enter the apartment. Both Agent Ramirez and Defendant
8  testified that Defendant opened the door. Agent Ramirez's further testimony
9  establishes that Defendant invited Agent Ramirez into the apartment, as well as other
10 agents who had been positioned in the hallway outside the apartment, and consented
11 to the agents looking through the apartment for Jessica.[1]

12      Once in Defendant's apartment, the agents kept Defendant and the other three
13 occupants (two females and one male) of the apartment separate. Defendant was
14 directed to sit on a couch as one or more agents watched over him. Agents went
15 through the rooms of the apartment in a "security sweep" and all occupants, including
16 Defendant, were asked for identification. Defendant provided either his entire wallet
17 to the agents or a Mexican driver's license. By this time, several agents had arrived.
18 The weight of the evidence further establishes a canine was there to assist the agents
19 in their search of the apartment which, ultimately, turned up neither Jessica nor any
20 physical evidence. Although the agents were armed, no weapons were pulled from
21 their holsters or otherwise displayed. Defendant was never Mirandized and was never
22 advised that he had a right not to consent to the entry of the agents into his home or to
23 the search.

24      Defendant did not feel that he was free to leave the apartment under the
25 circumstances that existed. In response to questioning by BPA Marc Gonzalez,

26

27     [1]Although Defendant's testimony strongly contradicted the testimony of Agent Ramirez, the
28 court finds the testimony of Agent Ramirez on these points to be more credible. In part, this finding is based on Defendant's acknowledgment that Agent Ramirez announced his presence, provided his credentials for inspection, that Defendant voluntarily opened his door thereafter, and that, knowing Jessica was not in his apartment, believed the authorities merely wanted to verify that fact.

1  Defendant admitted he was a citizen of Mexico and in the United States illegally.

2  Defendant was then arrested, handcuffed, and transported to a Border Patrol station.[2]

3  Defendant moves to suppress any statements he made under the Fourth and Fifth

4  Amendments. Specifically, Defendant contends he did not validly consent to the BPAs

5  entering his apartment, to their search or "security sweep" of his apartment, and that

6  therefore his Fourth Amendment rights were violated by these activities and by his

7  detention (or arrest) during these activities. Further, Defendant argues any statements

8  he made in response to questioning, either at his apartment or at the Border Patrol

9  station, were the product of Fourth Amendment violations and that any such statements

10 were taken in violation of his <u>Miranda</u> rights.

11 The government responds by arguing valid consent was given for the entry into

12 the apartment by BPAs and for the search or "security sweep"; hence, no Fourth

13 Amendment violation occurred. The government further contends that the detention

14 of Defendant and the questioning of Defendant "consisted of a routine field interview."

15 **ANALYSIS**

16 **Consent**

17 When valid consent is given for entry into and search of premises there is no

18 constitutional violation. <u>United States v. Rodriquez</u>, 464 F.3d 1072, 1077 (9th Cir.

19 2006). Although the totality of circumstances are to be considered in determining

20 whether purported consent is valid, five factors have been principally articulated by the

21 Ninth Circuit for a proper analysis of the question: (1) whether the defendant was in

22 custody; (2) whether the arresting officers had their guns drawn; (3) whether <u>Miranda</u>

23 warnings were given; (4) whether the defendant was notified of the right not to

24 consent; and (5) whether the defendant had been told a search warrant could be

25 obtained. <u>Id.</u>

26 After analysis of these factors, the court finds valid consent was given by

27

28     [2]The government proffered that Defendant was again questioned at the station, without <u>Miranda</u> warnings, for the purpose of being administratively processed for removal from the United States.

1   Defendant for entry into his apartment and the search or sweep thereafter.  Based on
2   the factual findings addressed above with respect to the first factor, Defendant was
3   never in custody up to the time he was placed under arrest and handcuffed.  Up to that
4   point, Defendant was merely being detained for security purposes while agents looked
5   for Jessica.  While it is true that Defendant was presumably not free to move about or
6   interfere as the search or sweep was being conducted, and he was asked for
7   identification, these facts alone did not amount to an arrest.  Defendant had been
8   informed "Jessica" was the subject of concern, had been asked for and given consent
9   to enter the apartment, and had been asked for and given consent to the search for
10  Jessica in the apartment.  There was nothing preventing Defendant from refusing or
11  terminating the encounter.  Moreover, while under these circumstances one objectively
12  might not choose to leave his home with law enforcement officials remaining therein,
13  such a decision would not be tantamount to a reasonable person objectively concluding
14  he is restrained from leaving.

15      As to the second and third factors, no guns were drawn (or brandished) and
16  Miranda warnings were not given (as inapposite).  Concerning the fifth factor,
17  Defendant was not told a search warrant could be obtained.   Of the five enumerated
18  factors, it is only the fourth, i.e., whether Defendant was informed of his right to refuse
19  consent, that gives pause.  Defendant was not so informed; however, under the factual
20  findings that have been made, the court concludes that this omission, significant though
21  it was, did not otherwise vitiate the indicia of valid consent in this case.  Importantly,
22  though Defendant has testified otherwise, no threat, coercion, or intimidation was used
23  to gain Defendant's consent.  Furthermore, it was apparent to all, including Defendant,
24  that the interest of the agents was Jessica, not Defendant.  Therefore, the court finds
25  that neither the entry into nor the search of Defendant's apartment constituted a
26  violation of Defendant's Fourth Amendment rights.  Moreover, neither asking for
27  identification from Defendant nor requesting Defendant to remain seated during the
28  search constituted an unlawful seizure.  See Muehler v. Mena, 544 U.S. 93, 98-101

1   (2005); <u>Dawson v. City of Seattle</u>, 435 F.3d 1054, 1065-67 (9th Cir. 2006).[3]

2   **Statements**

3   Defendant argues his <u>Miranda</u> rights were violated when he was subjected to

4   custodial interrogation at his apartment during which he admitted he was in the United

5   States illegally.  The government responds that Defendant was not in custody and that

6   Defendant was merely subject to "a brief routine field interview."  Government's

7   Response at 13.

8   The government's effort to draw a parallel between the facts of this case and the

9   "routine field interview" seems off the mark at first blush because this case deals with

10  the questioning of an individual inside his home, the paradigmatic context for

11  constitutional protection.   And, yet, the case law that generally deals with the

12  questioning of suspected aliens within the context of a <u>Terry</u> stop, or, under other

13  suspicious circumstances, offers the most relevant analysis.  <u>See, e.g.</u>, <u>United States v.</u>

14  <u>Galindo-Gallegos</u>, 244 F.3d 728, <u>modified</u> <u>at</u> 255 F.3d 1154 (9th Cir. 2001).

15  Specifically, Judge Paez in his concurring opinion cites several cases where BPAs have

16  properly stopped individuals upon reasonable suspicion they are aliens to investigate

17  the circumstances that provoked the suspicion.  <u>Galindo-Gallegos</u>, 244 F.3d at 734-36

18  (Paez, J., concurring).  These cases have upheld the asking of questions concerning

19  alienage similar to those asked of Defendant without the necessity of a <u>Miranda</u>

20  warning.  Why?  Because there existed suspicious circumstances, the questioning was

21  brief, and neither custodial interrogation nor arrest had occurred.  Even <u>Muehler v.</u>

22  <u>Mena</u>, <u>supra</u>, dealing with Fourth Amendment issues in a similar factual context,

23  provides some guidance for the <u>Miranda</u> question posed here:

24  The Court of Appeals also determined that the officers violated Mena's
    Fourth Amendment rights by questioning her about her immigration status

25  during the detention. 332 F.3d, at 1264-1266.  This holding, it appears,
    was premised on the assumption that the officers were required to have

26  independent reasonable suspicion in order to question Mena concerning
    her immigration status because the questioning constituted a discrete

27

28  [3]Although <u>Muehler</u> and <u>Dawson</u> concerned the ability of officers to control the movement of
    individuals as premises are being searched pursuant to a search warrant, the same rationale applies in
    this case where a search or security sweep is being conducted incident to valid consent.

Fourth Amendment event. But the premise is faulty. We have "held repeatedly that mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); see also INS v. Delgado, 466 U.S. 210, 212, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." Bostick, supra, at 434-435, 111 S.Ct. 2382 (citations omitted). As the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.

Muehler, 544 U.S. at 100-101.

In the present case, the court has previously found that Defendant was not in custody but was merely being restricted to a particular location while his apartment was being searched pursuant to his consent. The testimony before the court indicates that the questioning of Defendant was brief and limited to asking for his identification, about his citizenship, and whether he was legally in the United States. There also existed suspicious circumstances that brought the agents to Defendant's apartment. The agents, part of a human trafficking unit operating under the auspices of Immigration and Customs Enforcement, had responded to Defendant's apartment as part of their investigation of a female, Jessica, who was reportedly involved in that suspected activity. When Defendant was asked if Jessica was present at the premises, rather than disclaiming any knowledge as to who Jessica was, he responded that she was not in the apartment. Any suspicions the agents may have entertained about the apartment or its occupants would not have been allayed by Defendant's response. Under the totality of the circumstances, the questioning of Defendant did not require a prior Miranda warning, and the motion of Defendant to suppress Defendant's responses up to the point of arrest is denied.

After the arrest of Defendant and after he was transported to the Border Patrol station, Defendant was again questioned concerning his immigration status. At the time of the May 4, 2007 hearing, the court indicated that any such interrogation would clearly seem to be custodial in nature and, without a Miranda warning, inadmissible in

1    a criminal trial.  The government's response, that such questioning was undertaken
2    only for the purpose of processing Defendant administratively, would not seem to
3    constitute an exception to the principle that custodial interrogation requires <u>Miranda</u>
4    advisement.   Otherwise, it would seem the government could always justify non-
5    Mirandized custodial interrogation on the premise that such questioning is always
6    initially for administrative purposes, leaving its prosecutorial options open based on
7    the answers.  Such a circumstance, whether reflecting a policy or the facts of an
8    individual case such as this one, cannot be justified under the <u>Miranda</u> paradigm.
9    There can be no question that such a circumstance involves custodial (Defendant was
10   not free to leave nor could he objectively entertain any prospect of doing so)
11   interrogation designed to elicit responses that, in fact, tend to incriminate.

12   **CONCLUSION**

13        Defendant's Fourth and Fifth Amendment motions to suppress are denied with
14   respect to Defendant's statements (and other identifying information) up to the time
15   Defendant was arrested in his apartment.

16        Defendant's motion to suppress any statement elicited during custodial
17   interrogation without prior <u>Miranda</u> warning and waiver at the Border Patrol station is
18   granted.

19
20        **IT IS SO ORDERED.**
21
22   DATED: _5/22_, 2007
23                                              **JEFFREY T. MILLER**
                                                United States District Judge
24   cc:    all parties
25   06cr2504 De-Leon Godinez Ruling.wpd
26
27
28